UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

MICHAEL D. JACKSON,

Plaintiff,

v.

MARTIN O'MALLEY, Commissioner of Social Security,

Defendant.

No. 1:23-cv-00423-GSA

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF MICHAEL D. JACKSON AND AGAINST DEFENDANT COMMISSIONER OF SOCIAL SECURITY**

**(Doc. 13, 15)**

## I.     Introduction

Plaintiff Michael D. Jackson seeks judicial review of a final decision of the Commissioner of Social Security denying his application for supplemental security income pursuant to Title XVI of the Social Security Act.[1]  Because substantial evidence and applicable law do not support the ALJ's decision, the appeal will be granted.

## II.     Factual and Procedural Background

On November 28, 2016, Plaintiff applied for supplemental security income.  The Commissioner denied the application initially on January 27, 2017, and on reconsideration on June 13, 2017.  The ALJ held three hearings in February 2019, June 2019 and July 2019.  AR 30–141.  On August 6, 2019, the ALJ issued an unfavorable decision.  AR 12–29.  The Appeals Council denied review on June 29, 2020.  AR 1–6.

Plaintiff sought judicial review of the ALJ's decision.  AR 1007–13.  Pursuant to the parties' stipulation, the Court remanded for further administrative proceedings.  AR 1024–28.  On remand the ALJ held another hearing on September 15, 2022.  AR 948–82.  The ALJ issued an unfavorable decision on December 30, 2022 (AR 920–947) and this appeal followed.

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge.  *See* Docs. 7 and 9.

### III.    The Disability Standard

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.    "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted).  If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.    42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the

claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).  While the Plaintiff  bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience.  *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

### IV.    The ALJ's Decision

At step one[2] the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 28, 2016, the application date.  AR 926.

At step two the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease; degenerative joint disease; scoliosis; and chronic obstructive pulmonary disease.  AR 926.  At step two the ALJ also found that Plaintiff had the following non-severe impairments: right carpal tunnel syndrome; hiatial hernia and gastric perforation status post-surgical repair in 2016; depression; and anxiety.  AR 926.

At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 927.

Prior to step four, the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform light work as defined in 20 CFR 416.967(b) with the following limitations: lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit about 6 hours in an 8-hour workday with normal breaks; stand and/or walk about 6 hours in an 8-

---

[2] Unless otherwise specified, all references herein are to the post-remand ALJ decision dated December 30, 2022 (AR 920–947), which is the subject of this appeal.

hour workday with normal breaks; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally kneel, crouch, or crawl; never stoop; never reach overhead with the dominant upper extremity; occasionally reach in other directions with the dominant upper extremity; frequently reach with the non-dominant upper extremity; frequently operate foot controls; never work at unprotected heights or around fast moving machinery; never work in environments exposing him to concentrated levels of dust, fumes, or gases.  AR 927–937.

At step four the ALJ concluded that Plaintiff had no past relevant work.  At step five the ALJ concluded that there were jobs existing in significant numbers in the national economy that Plaintiff could perform: furniture rental consultant; surveillance system monitor; and election clerk.  AR 937.  Accordingly, the ALJ concluded that Plaintiff was not disabled at any time since his application date of November 28, 2016.  AR 939.

## V.    Issues Presented

Plaintiff asserts one claim of error, that the ALJ's analysis of Plaintiff's subjective complaints is not supported by substantial evidence.

### 1.    Applicable Law

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity.  *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

The ALJ is responsible for determining credibility,[3] resolving conflicts in medical testimony and resolving ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  A

---

[3] Social Security Ruling 16-3p applies to disability applications heard by the agency on or after March 28, 2016.  Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities."  S.S.R. 16-3p at 1-2.

claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability.  42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p.

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen*, 80 F.3d at 1281; S.S.R 16-3p at 3.  First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281–82.  If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities."  S.S.R. 16-3p at 2.

An ALJ's evaluation of a claimant's testimony must be supported by specific, clear and convincing reasons.  *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014); *see also* S.S.R. 16-3p at *10.  Subjective testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but the medical evidence "is still a relevant factor in determining the severity of claimant's pain and its disabling effects."  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).

As the Ninth Circuit recently clarified in *Ferguson*, Although an ALJ may use "*inconsistent* objective medical evidence in the record to discount subjective symptom testimony," the ALJ "cannot effectively render a claimant's subjective symptom testimony superfluous by demanding positive objective medical evidence fully corroborating every allegation within the subjective testimony."  *Ferguson v. O'Malley*, 95 F.4th 1194, 1200 (9th Cir. 2024) (emphasis in original).

In addition to the objective evidence, the other factors considered are: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5)

treatment other than medication; 6) other measures the claimant uses to relieve pain or other symptom; 7)) Other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 416.929(c)(3).

### 2. **Analysis**

#### a. **Background and the Prior Decision**

By way of background, Plaintiff has a history of scoliosis with spinal fusion in 1993 and repair of pseudarthrosis in 1996 (Exhibits 4F/2; 5F), though he suffered significant residual scoliosis thereafter.  A January 2017 exam noted markedly deformed spine/ribcage on examination, and back x-rays revealed residual thoracic dextroscoliosis of 54 degrees, extensive thoracic lumbar fusion, diffuse thoracic disc narrowing, diffuse lumbar disc narrowing, and moderate osteopenia (Exhibit 3F/9, 12).

September 2018 x-rays showed thoracic dextroscoliosis of 53 degrees.  AR 20-21.  July 2019 imaging again confirmed "severe thoracic dextroscoliosis" of 55 degrees.[4]  AR 909.  July 2019 x-rays also confirmed cervical thoracic levoscoliosis" of 37 degrees and lumbar levoscoliosis of 32 degrees.[5]  AR 908, 910.

Nevertheless, 54 degrees still exceeds the 40-degree threshold for "severe" scoliosis,[6] which "poses significant risks for health problems and reduced quality of life."[7]  Further, "If the curvature exceeds 70 degrees, the severe twisting of the spine can cause the ribs to press against the lungs,

---

[4] In contrast, a January 2019 x-ray showed 79 degrees of dextroscoliosis, though the medical expert at the initial hearing suggested this was a mistake in positioning by the x-ray technician or a transcription error by the radiologist, and that at 79 degrees the claimant "would be bent so far to the side that he would have difficulty standing and walking."  AR 20.  The ALJ agreed with this finding which is not disputed.

[5] Levoscoliosis denotes curvature to the left, while dextroscoliosis denotes curvature to the right.  Specifically, going from cervical to thoracic to lumbar, his spine was curved 37 degrees to the left, 55 degrees back to the right, and 32 degrees back to the left.

[6] 0 to 9 degrees denotes "no scoliosis," 10 to 24 degrees denotes "mild scoliosis," 25 to 39 degrees denotes "moderate scoliosis," and more than 40 degrees denotes "severe scoliosis." https://my.clevelandclinic.org/health/diseases/15837-scoliosis.

[7] https://www.mountsinai.org/health-library/report/scoliosis

restricting breathing, and reducing oxygen levels." *Id.* Though Plaintiff's curvature did not exceed 70 degrees, the medical expert (Dr. Lorber) testified that Plaintiff's residual scoliosis affected his lung function and caused his COPD. AR 21. The curvature also affected the alignment of the stomach and the esophagus leading to a hiatial hernia requiring surgical repair in 2016. *Id.* Dr. Lorber further testified that it is not uncommon for a patient with residual scoliosis to have progressive pain throughout the spine. *Id.* Dr. Lorber opined Plaintiff had a sedentary exertional capacity of lifting no more than 10 pounds, sitting 6 of 8 hours, and standing/walking 2 of 8 hours. *Id.*

In a 2-page RFC analysis, the first ALJ who issued an unfavorable decision on August 6, 2019, only briefly covered Plaintiff's subjective statements concerning generalized back pain, breathing problems, activity limitation, as well as a chief complaint of thoracolumbar pain as reported to the consultative examiner, and pain levels ranging from 3 to 9 in the treatment records. AR 18-21. The ALJ gave Dr. Lorber's opinion the most weight noting there were no more restrictive opinions in the record. The ALJ did not revisit Plaintiff's subjective statements or reasoning for discounting the same either overtly or by reasonable implication.

The parties stipulated to remand for further proceedings. On remand, a new ALJ was selected and the Appeals Council issued a directive noting that the ALJ failed to provide sufficient rationale for rejecting the Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms. AR 1035–36. The Appeals Council also offered an extensive additional directive which in large part simply re-articulated the same statutory and regulatory standards that applied in the first instance.

After the August 6, 2019, unfavorable ALJ decision, but prior to the December 2022 unfavorable ALJ decision, Plaintiff developed bilateral hip pain, worse on the left, underwent workup at USC Keck with imaging reflecting moderate joint space narrowing bilaterally with

"significant protrusion deformity" on the left and "mild protrusion deformity" on the right. AR 1652. The orthopedic surgeon with whom he consulted recommended total hip replacement on the left which was scheduled for December 2021. AR 1652, 1566, 1568. As of the September 2022 ALJ hearing the surgery had not taken place with the record variously suggesting it was delayed generally due to Covid (AR 963) and/or the need for him to go off narcotics in advance (AR 934) because chronic pain with narcotic dependance would make post-operative pain management more difficult (AR 1656).

### b.   The Second ALJ Decision on Remand

The ALJ appointed on remand issued the same findings as the first ALJ with two exceptions: 1) the ALJ added two severe impairments at step two (degenerative joint disease and scoliosis[8]); and 2) the ALJ concluded Plaintiff could perform light exertional work (as compared to sedentary), though the VE did identify both light and sedentary jobs at step five. AR 926–939.

The ALJ recited Plaintiff's subjective complaints as reported in his Pain Questionnaire, chiefly: he has pain radiating from the upper and lower back exacerbated by activity; it is partially but not fully alleviated by rest and Tramadol; his activities included light housekeeping without assistance and driving as needed, though he takes breaks; he could walk 50 yards, stand 20 minutes at a time and sit 1 hour at a time; he drives and does light housekeeping chores without assistance. AR 928 (citing Ex. 4E, AR 320–23).

The ALJ also recited Plaintiff's symptom allegations as reported to the consultative examiner, Dr. Van Kirk, chiefly: that thoracolumbar pain was the primary impediment keeping him from working; the pain is exacerbated by heavy lifting, postural activities, coughing/sneezing, and cold weather; he can sit, stand and walk for about 20 minutes each. AR 938 (citing Ex. 4F at 2, AR

---

[8] The omission of scoliosis from the list of severe impairments at step two of the first decision was almost certainly a transcription error as it was discussed in some detail at step four.

510).

The ALJ also recited Plaintiff's pertinent testimony which overlapped with statements he made to treating providers, but was sufficiently nuanced and detailed that quotation in full is more useful than paraphrasing:

> The claimant alleged he has problems breathing, which gives him headaches and he experiences more back pain, which hurts to sit or stand long periods of time. Lifting and bending causes pain, numbness, and muscle spasms. Cold makes it worse. He stated his sciatica has become worse and he has fallen down. He stated he has fatigue which does not allow him to do the things he used to. He stated he has shortness of breath with exertion, which makes it harder to do chores, such as dishes, laundry, and mowing (Exhibit 6E, pp. 2, 5).
>
> The claimant has reported his pain increases with increased activity (Exhibit 14F, p. 71; Hearing Testimony), and therefore, he must lie down to rest every hour, thus alleging he must take regular unscheduled breaks (see, Exhibit 20E). He reported he is able to do dishes and clean house a little, but needs to sit down about every 5 minutes because sciatica and back pain starts acting up (Exhibit 9E, p. 6). things he used to. He stated he has shortness of breath with exertion, which makes it harder to do chores, such as dishes, laundry, and mowing (Exhibit 6E, pp. 2, 5)
>
> At his hearing, the claimant testified he is right handed. He prepares easy/simple meals, drives short distances, but after about 40 minutes, he has pain. He does the dishes, but it takes 1 ½ hours. He stated he could stand 15 to 20 minutes. He alleged he has arm problems affecting his ability to hold the dishes while washing them. He stated his hands hurt and his arms get tired. He now sees a doctor about hand numbness and has been told he has arthritis in the hips and back, but is not sure what is wrong with the hands yet. He has not had hip surgery. He stated his insurance finally approved imaging for his hips, but he has no one to take him four hours away to Los Angeles. He stated he goes grocery shopping alone for small items, but takes someone with him if he needs large items. For example, he has no problems putting a 20 pound bag of dog food in the cart when dragging it off the shelf, but does not believe he could retrieve it from a bottom shelf to place in the cart. He stated he cannot bend due to his spine problems, but is able to bend at the knees, although this is more difficult to stand back upright because it hurts his hips and knees. He is able to walk 10 minutes before needing a break. He stated, for example, he would be able to walk around the high school (quarter mile) track about two times within 10 minutes.

AR 929,

The parties dispute the sufficiency of the ALJ's ensuing discussion. In pertinent part, the ALJ stated:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged

9

symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

Although the objective treatment records, personal observations, clinic notes, diagnostic studies, laboratory tests, and physical examinations confirm the presence of medically determinable impairments that would reasonably impose significant limitations to his ability to perform work related activities, the extent to which these impairments limit the claimant's exertional and non exertional functions is discussed in the opinion evidence.

AR 932-933.

At the conclusion of the RFC analysis the ALJ further explained as follows:

The claimant's subjective complaints of pain and functional difficulties have been given due consideration and accommodated within the established residual functional capacity. While the record documents the claimant's complaints of pain that is sometimes substantial, there is no opinion in the record that supports a disabling level of limitation, even considering pain.

Based on my review of the entire record and the hearing testimony, I conclude the claimant's subjective allegations of debilitating pain and limitation precluding all work activity are not supported by the objective evidence to the extent alleged. The physical examinations consistently show relief with medications. His activities of daily living are not extremely limited and he does not require assistance for most of his routine activities. He is able to drive, prepare simple meals, shop in stores, perform light household chores, and provide for his own entertainment. His activity level does not appear to be consistent with one who suffers such severe limitations as to preclude all work activity. Finally, some of his alleged symptoms have been responsive to treatment and do not impose a disabling degree of limitation.

AR 937.

The ALJ's discussion as a whole was reasonably well grounded in the regulatory factors of: 1) the objective medical evidence; 2) Plaintiff's course of treatment; 3) response to medication; 4) daily activities; and 5) the opinion evidence.  However, the ALJ's discussion of those factors, though topical, fell short.

### i.   Objective Medical Evidence[9]

---

[9] The ALJ discussed Plaintiff's COPD and related dyspnea and alleged exertional intolerance in detail, ultimately concluding that "claimant's respiratory disorder does not significantly impact his exertional capacities."  AR 930.

Subjective testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but the medical evidence "is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).

The ALJ relied heavily on Plaintiff's purported response to medication, discussed in more detail below, though this relates more to one of the "other" factors under 20 C.F.R. § 404.1529(c)(3), and is more subjective than objective.

In terms of imaging and clinical findings, there is no dispute that Plaintiff suffers severe residual thoracic dextroscoliosis (curvature to the right) of 54+ degrees (14 degrees above "severe"), and compensatory lumbar levoscoliosis (curvature to the left) of 39 degrees (the high end of "moderate" but only 1 degree below "severe"). AR 932. Plaintiff also had moderate joint space narrowing in bilateral hips upon imaging and "significant protrusion deformity" of the left hip. AR 1431, 1433, 1667.

Relatedly, the ALJ explained:

> The record also confirms a history of scoliosis with surgery (spinal fusion in 1993; repair of four pseudoarthrosis in 1996) (Exhibits 4F, p. 2; 5F). The claimant reported back pain during visits to Sequoia Family Medical Center in 2016, but the physical examinations show few related clinical abnormalities (Exhibit 2F). In January 2017, Sequoia providers noted markedly deformed spine/ribcage on examination. Back x-rays revealed thoracic dextroscoliosis 54 degrees, lumbar levoscoliosis 39 degrees, extensive thoracic lumbar fusion, diffuse thoracic disc narrowing, diffuse lumbar disc narrowing, and moderate osteopenia (Exhibit 3F, pp. 9, 12).

The 2016 Sequoia Family Medical Records (Exhibit 2F), span 50 pages of handwritten notes which are largely illegible, which is not to suggest that this failure lies with the ALJ, just that it is not possible to confirm or disconfirm the ALJ's implication that they were benign

---

Plaintiff does not challenge this conclusion, nor does he highlight testimony or other pertinent evidence that should have been incorporated into the RFC.

examinations.  Here, although the record does contain ample other evidence it is not necessary to discuss those records given they were dated March 2016 through October 2016 which predated the relevant period that began in November 2016.  Further, as the ALJ's next quoted sentence above illustrates in 2017, the Sequoia providers did note markedly deformed spine/ribcage on examination in 2017.  AR 932.

The ALJ also described the results of consultative physical examinations with Dr. VanKirk (May 2017) and Dr. Siekerkotte (May 2022), both of which documented some spinal range of motion restrictions, the latter of which documented positive straight leg raise bilaterally, but were otherwise normal.  AR 933–34.   The ALJ also discussed the evidence concerning Plaintiff's hips from USC Keck in 2021.  *Id* (citing AR 1652). Defendant emphasizes that the spinal and hip imaging findings were "moderate," however, this is only true of the lumbar DJD and joint space narrowing of the hips.  Resp. at 5, Doc. 15 (citing (AR 908, 1431, 1433).   Importantly, the post-surgical residual scoliosis was far beyond severe as to thoracic dextroscoliosis (54 degrees), and within 1 degree of severe as to lumbar levoscoliosis (39 degrees).  Further, Dr. Lieberman, the hip surgeon at USC Keck with whom Plaintiff had a pre-surgical consult, described an additional abnormality, namely "significant protrusion deformity" on the left  (AR 1667), and the fact that he recommended total hip arthroplasty (which was scheduled though ultimately not undertaken as of the hearing date)[10] does not suggests a benign condition or a condition of only moderate severity.

Defendant suggests that one would expect to see greater deficiencies upon physical examination to corroborate Plaintiff's subject reports of incapacitating pain.  To the contrary, the medical expert Dr. Schmitter testified that Plaintiff's motion "was actually…pretty good, but the complaint of pain was obviously severe enough that doctors at USC felt that it was appropriate to

---

[10] The hip surgeon at USC, Dr. Lieberman, identified a number of obstacles that needed to be addressed before surgery, including a pre-op pain management referral, spinal consultation given the protrusion deformity, and optimization for his "twisted lung." AR 1653.

proceed with total hip surgery."[11] AR 959.  Thus, based on Plaintiff's complaints of hip pain with sitting and ambulation (left greater than right), corroborated by the significant acetabular protrusion deformity (left greater than right), Dr. Leiberman at USC found the subjective complaints of pain sufficiently credible to warrant a total hip replacement notwithstanding the relative lack of severe abnormalities upon physical examination such as to muscle strength, gait, or range of motion.

As the Ninth Circuit recently clarified in *Ferguson*, although an ALJ may use "*inconsistent* objective medical evidence in the record to discount subjective symptom testimony," the ALJ "cannot effectively render a claimant's subjective symptom testimony superfluous by demanding positive objective medical evidence fully corroborating every allegation within the subjective testimony." *Ferguson v. O'Malley*, 95 F.4th 1194, 1200 (9th Cir. 2024) (emphasis in original).

On balance, the objective medical evidence here is not inconsistent with Plaintiff's alleged inability to stand and walk more than 20 minutes without rest, sit more than an hour, perform postural activities such as bending over, and his need to lay down hourly, among other deficiencies.

### ii.    Course of Treatment

The ALJ observed that Plaintiff's back pain was "treated conservatively with medication." AR 934.  The ALJ also noted Plaintiff's report to Dr. VanKirk that his treatment "included physical therapy, which helped somewhat, but no chiropractic, acupuncture, injection therapy, or braces." To the extent the ALJ intended to convey that Plaintiff's conservative treatment undermined his allegations as to disabling pain, the inference is not supported.

As discussed, Plaintiff underwent spine surgery in 1993 with residual scoliosis thereafter.

---

[11] Dr. Schmitter explained that patients with severe hip arthritis generally have very limited hip internal rotation, limited abduction, and limited flexion, whereas Plaintiff had 10 degrees, 35, and 90 respectively, which Dr. Schmitter considered " pretty good".  AR 959 (citing AR 1652).  That may be true of 35 degrees of abduction (normal is 45-50), and 90 degrees of flexion (normal is 110-130), both of which were within about 30% of normal.  But that is not true of 10 degrees of internal rotation which is 75% less than the normal range of 40 degrees. https://web.mit.edu/tkd/stretch/stretching_8.html

There is no indication that additional spinal reconstructive surgery was indicated or recommended as a treatment option.  Further, as discussed, he attended a surgical consultation with Dr. Leiberman at USC Keck in 2021 who recommended total left hip arthroscopy.

Further, though it is somewhat of an open question whether opioids constitute conservative treatment, the Appeals Council's order on remand suggests it is not.  *See* AR 1035:"The ALJ found that treatment with medication was conservative, but also noted treatment with methadone for pain, which appears to conflict with the finding.".

### iii.   Response to Treatment

The ALJ emphasized Plaintiff's purportedly positive response to pain medication throughout the RFC analysis.

As an initial matter, although the ALJ noted September 8, 2015 records documenting the claimant's pain level as 3/10 with Ibuprofen 600 mg three times daily (Exhibit 7F, pp. 4-5; AR 931), it is important to note that this was more than 1 year prior to the relevant period which began on his SSI application date of November 28, 2016.  The cited record therefore is not emblematic of Plaintiff's pain level during the relevant period, particularly considering he developed hip pain in between the two ALJ decisions dated August 2019 and December 2022.

Next, the ALJ explained as follows:

Pain management records from May 23, 2017 through February 14, 2019 also document average pain as being reported as no higher than 6/10 (see, Exhibit 14F, p. 36), with most reports indicating much lower levels of pain, such as 3/10 (pain sometimes distracts me) and 4/10 (distracts me, can do usual activities (Exhibit 14F). Pain management notes from February 2019 indicate the claimant reported more pain with cool weather with average pain reported as 4/10 (Exhibit 14F, p. 11). Although the claimant denied medication side effects, Dr. Calvon Voong, M.D., advised the claimant to avoid dangerous activities such as driving or operating dangerous machinery (see, Exhibit 14F, p. 118).

AR 931.

The ALJ's generalization concerning the pain levels reported in Exhibit 14F is not

particularly helpful as Exhibit 14F contains 118 pages of examination records spanning nearly two

years, May 2017 through February 2019, from Dr. Calvon Voong.  The ALJ provided only two pin

citations, first to page 36 (AR 766) which documented average pain level 6/10, and the second to

pin-citation page 11 (AR 741) documenting average pain level of 4/10.  If, as the ALJ stated, most

of the examinations did in fact document "much lower levels of pain, such as a 3/10," it is not clear

why the ALJ's two purportedly representative pin-citations would document a 6/10 and a 4/10.

Notwithstanding, the Court has no obligation to scour that 118-page data set to confirm or refute

the ALJ's generalization.  But if the Court were to treat the ALJ's only two pin citations as

exemplary of the examinations in Exhibit 14F, the average pain level would be 5/10, and notably

those values were *with* medication.  Further, absent any reason to discredit Plaintiff's allegations

about his self-imposed limitations on exertion, activity, and long periods of sustained positions such

as sitting (AR 1167), a 5 out of 10 average pain level would likely reflect his pain level

notwithstanding those self-imposed limitations, limitations which would not be acceptable in the

context of full-time employment.

The ALJ further explained as follows:

Pain management progress notes of March 15, 2019 reveal the claimant stated his
pain management regimen provided reasonably good relief and functional
improvement with basic self-care activities and household chores. He denied
adverse reactions or side-effects on 10mg Methadone twice per day for his back
pain. He rated his average pain as 5/10 (pain interrupts some activities) (Exhibit 20F,
p. 23). On examination, his gait was non-antalgic and he was in no acute distress
due to pain. His mood and behavior were appropriate (Exhibit 20F, p. 24). The same
objective findings and subjective reports, i.e., non-antalgic gait, no acute distress
due to pain, average pain 5/10, improved functional abilities, reasonably good relief
with medication regimen, no side effects, were noted at the subsequent encounters
of April 12, 2019, May 10, 2019, June 11, 2019 (Exhibit 20F).

AR 932

"Reasonably good relief" is somewhat non-specific, particularly given all 4 examinations

in Exhibit 20F documented average pain level 5 out of 10 with worst pain level 8 out of 10 (AR

15

879; 882; 896; 900).   Again, as mentioned above,   with an average pain level of 5/10 notwithstanding pain medication, and significant limits on exertional activity and sustained positions (standing and walking no more than 20 minutes at a time, sitting 1 hour, and periodically laying down throughout the day), it is reasonable to assume that Plaintiff's pain levels would be even worse in the context of full-time employment.  Further, these records pre-date the onset of Plaintiff's hip pain which began between the two ALJ's opinions as corroborated by imaging and a referral for a surgical consultation with an arthroscopic hip surgeon at USC Keck who recommended total hip replacement.  Thus, Plaintiff's overall pain level would likely be greater with the more recent onset of hip pain.

In sum, the records concerning Plaintiff's response to pain medication did not undermine Plaintiff's allegations of debilitating pain.

### iv.    Daily Activities

An ALJ can rely on a claimant's daily activities as a basis for discrediting a claimant's testimony if: (1) the daily activities contradict the claimant's other testimony; or (2) "a claimant is able to spend a substantial part of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting."  *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

The ALJ extensively described Plaintiff's ADLs, and importantly the limitations on the duration and extent of those activities, including as he reported them at the hearing in his exertional questionnaires to both his providers and to the consultative examiners:

> His daily activities, despite the pain, include cleaning house and driving as needed. He stated he takes breaks during the day. He alleged he could walk 50 yards, stand 20 minutes at a time, and sit 1 hour at a time. He drives, and does light housekeeping chores without assistance (Exhibit 4E).
>
> . . .
>
> The pain increases if he has to lift heavy objects, twist, turn, climb, run, jump, squat,

16

go up and down ladders, go up and down stairs frequently, crouch, crawl or even attempt to do these activities. He can stand, walk and sit for about 20 minutes. Coughing or sneezing does increase the pain. No bowel or bladder trouble. Cold weather enhances the pain in the thoracolumbar spine (Exhibit 4F, p. 2).

. . .

The claimant has reported his pain increases with increased activity (Exhibit 14F, p. 71; Hearing Testimony), and therefore, he must lie down to rest every hour, thus alleging he must take regular unscheduled breaks (see, Exhibit 20E). He reported he is able to do dishes and clean house a little, but needs to sit down about every 5 minutes because sciatica and back pain starts acting up (Exhibit 9E, p. 6).

At his hearing, the claimant testified he is right handed. He prepares easy/simple meals, drives short distances, but after about 40 minutes, he has pain. He does the dishes, but it takes 1 ½ hours. He stated he could stand 15 to 20 minutes. He alleged he has arm problems affecting his ability to hold the dishes while washing them. He stated his hands hurt and his arms get tired. He now sees a doctor about hand numbness and has been told he has arthritis in the hips and back, but is not sure what is wrong with the hands yet. He has not had hip surgery. He stated his insurance finally approved imaging for his hips, but he has no one to take him four hours away to Los Angeles. He stated he goes grocery shopping alone for small items, but takes someone with him if he needs large items. For example, he has no problems putting a 20 pound bag of dog food in the cart when dragging it off the shelf, but does not believe he could retrieve it from a bottom shelf to place in the cart. He stated he cannot bend due to his spine problems, but is able to bend at the knees, although this is more difficult to stand back upright because it hurts his hips and knees. He is able to walk 10 minutes before needing a break. He stated, for example, he would be able to walk around the high school (quarter mile) track about two times within 10 minutes.

. . .

The claimant reported he walks for exercise and is able to walk 2 blocks without stopping, and then must stop due to hip pain.

. . .

He is able to do whatever cooking is required. He is able to do the household chores of vacuuming, laundry, taking the trash out and dishes. What he is able to do on a regular basis is as follows: He gets up in the morning, takes a shower and has some breakfast. He does have a driver's license and, in fact, drove himself to the clinic. He does take a walk outdoors every day. He does not ride a bicycle. He watches TV about two hours a day, gets on the computer, does texting and telephone work about five hours a day total and reads about two hours a day (Exhibit 4F, p. 3).

The claimant saw Dr. Birgit Siekerkotte, M.D. for an internal medicine consultative examination on May 3, 2022, at which time he reported his activities of daily living include taking care of his personal needs. He can sweep, mop, vacuum, dishes,

17

laundry, light shopping, and cooking, although, he states that all of these activities are done slowly. He spends his days lying down about half the day. He works with computers and likes watching television (Exhibit 29F, p. 4)

It is debatable whether minimalistic housekeeping (vacuuming, dishes, trash), simple meal preparation, short driving trips to shop for small items, and walking a couple blocks for exercise involve "the performance of physical functions that are transferable to a work setting." *See Orn*, 495 F.3d 639.  Even assuming those activities are transferable to a work setting, the ALJ's above-quoted discussion does not suggest that Plaintiff was able to spend "a substantial part of [his] day" engaged in those activities.  To the contrary, most of the cited activities were limited in terms of the amount of time he could spend doing them without stopping and resting every few minutes and spending half of the day laying down.

Nor is the testimony self-contradictory, despite Dr. Schmitter's suggestion that Plaitniff's reports of pain were inconsistent, of which the ALJ observed and which appeared somewhat integral to Dr. Schmitter's opinion about Plaintiff's exertional capacity.  Notably, the ALJ gave that opinion "much weight."  AR 936, 957.  Granted, Plaintiff did give a range of estimates as to standing/walking/sitting tolerance, for example, variously stating he could: 1) walk 50 yds, stand 20 minutes and sit 1 hour; 2) sit/stand/walk for 20 minutes each; 3) drive for 40 minutes; 4) walk 2 blocks without stopping; and 5) walk twice around a high school track (quarter mile).  This, however, is a reasonably consistent account.  Some degree of variation in Plaintiff's self-reported exertional tolerances throughout the record can be expected considering Plaintiff offered these self-reported exertional tolerances in various contexts and to various individuals-- four administrative hearings between the two ALJ decisions, various exertional activity questionnaires, verbal reports to the consultative examiners, and verbal reports to his treating providers.  Further, Plaintiff offered these reports over a nearly six-year period of time beginning with his application on November 28, 2016, up to and including the final ALJ hearing on September 15, 2022.  During that time he began

having bilateral hip problems culminating in the workup at USC Keck and a referral for pre-surgical consultation.  Thus, it is reasonable that Plaintiff's exertional capacity would ebb and flow during that time, and certainly understandable that his estimates were not always precisely aligned.  In any event, even the least restrictive version of his exertional self-assessment would fall short of the requirements of sedentary work which require a claimant to sit 6 of 8 hours and stand/walk about 2 of 8 hours. SSR 83-10.

In sum, Plaintiff's daily activities did not undermine his allegations of disabling pain.

### v.       The Medical Opinions

In support of the RFC for light exertional work, the ALJ correctly observed that "there is no opinion in the record that supports a disabling level of limitation, even considering pain."  AR 937.  However, only one of the doctors who rendered an opinion had a full clinical picture.

Indeed, as to the two non-examining state agency consultants who reviewed Plaintiff's file at  both the initial and reconsideration levels in 2017 (also known as the Disability Determination Service doctors), the ALJ explained: "I accord limited weight to the Disability Determination Service medical assessments as these were based on a limited review of the relevant evidence and the opinions did not address the hip impairment which was clinically developed much later."  AR 933. Similarly, as to the May 2017 consultative examination with Dr. VanKirk, the ALJ accorded it only "some weight," explaining that Dr. Van Kirk also "did not address the hip impairment or the effects of the spinal impairment on the claimant's shoulder."  *Id.*

As to the May 2022 consultative examination with Dr. Siekerkotte, the ALJ noted that Dr. Siekerkotte was made aware of Plaintiff's bilateral hip pain and osteoarthritis as set forth in the "History of Present Illness".  AR 1555.  However, the "review of records" section only reflects that Dr. Siekerkotte reviewed spinal imaging documenting scoliosis, but not hip imaging documenting moderate joint space narrowing with "significant protrusion deformity."  The history of present

illness reflects only that Plaintiff stated he had been recommended for total hip arthroplasty.  AR 1555.  If Dr. Siekerkotte had the imaging records documenting the severity and nature of the pathology, and the records from the USC Keck surgical consultation documenting the recommendation for total hip arthroplasty-- facts which support Plaintiff's alleged exertional limitations-- it is likely that these would have better informed the opinion.

Finally, the ALJ gave "much weight" to the opinion of the medical expert Dr. Schmitter, who testified at the hearing and who was able to review the complete medical file including the records concerning Plaintiff's hip.  AR 936.  Notably, Dr. Schmitter did not have the opportunity to examine Plaintiff, though he testified at the hearing.  He stated he had never treated a scoliosis patient in his practice though he's "certainly seen" and "know(s) a moderate amount about scoliosis."  AR 954.  Significantly, he mischaracterized the severity of Plaintiff's scoliosis by stating that Plaintiff's scoliosis overall as "mild to moderate" (AR 958 referencing Exhibits 21, 22, and 23F by exhibit number which included cervical, thoracic, and lumbar) when in fact Plaintiff had "cervical thoracic levoscoliosis" of 37 degrees (moderate),[12] "thoracic dextroscoliosis" of 55 degrees (severe), and "lumbar levoscoliosis" of 32 degrees (moderate).  AR 908-910.  Even though the "cervical thoracic levoscoliosis" and "lumbar levoscoliosis" radiology reports did not have a severity description accompanying the scoliosis finding, both figures significantly exceeded the threshold for "moderate" (25 degrees.).

Just as importantly, Dr. Schmitter separately characterized the thoracic dextroscoliosis of 54[13] degrees as "moderately significant" (AR 955) when the radiology report specifically states "severe thoracic dextroscoliosis," and the literature, such as the resource cited above, uniformly

---

[12] https://my.clevelandclinic.org/health/diseases/15837-scoliosis
[13] It was variously identified in the radiology reports as 54 and 55 degrees, both of which significantly exceed the 40 degree cutoff for what is considered severe, so that distinction was not the source of Dr. Schmitter's apparent confusion.

characterizes anything above 40 to 45 degrees as severe.  AR 909.

   Both of these mischaracterizations cast doubt on the reliability of the opinion he offered moments later about the limitations attributable to Plaintiff's scoliosis.[14]  As a preface, much of his testimony was in response to questions as to whether Plaintiff met a listing, and/or the presence of neurological deficits, which he noted were uncommon with scoliosis, though the responses were broader in scope.  Dr. Schmitter testified that Dr. Van Kirk's assessment, lift 20lbs frequently, 10 occasionally, stand/walk 6 of 8 hours, would be accurate for the period prior to the onset of Plaintiff's hip pain, after which he would be more limited in terms of standing/walking ability, but not weightlifting.  AR 957-58.  As for the post-hip pain functional tolerances, Dr. Schmitter opined Plaintiff could stand 4 of 8 hours and walk 2 to 4, though he did not specify if those were overlapping time limits or cumulative time limits, but the ALJ apparently concluded they were cumulative such that he could stand and walk 6 of 8 hours.  Dr. Schmitter further explained that Plaintiff could have postural limitations which the ALJ did account for.  AR 959.

   Dr. Schmitter emphasized several times the subjective nature of the limitations arising from hip pain and scoliosis, though the physicians at USC Keck clearly found Plaintiff's level of pain justified surgery for Plaintiff's left hip and that a scoliosis patient would commonly continue to have "moderate" or "variable" degree of pain even after surgery.  AR 959, 962–63.  Finally of note, Dr. Schmitter indicated Plaintiff would need standing/walking breaks to accommodate hip pain but he could not opine on the frequency and duration of the breaks.  AR  963.

   Importantly, the three opinions rendered prior to the first ALJ decision, Dr. VanKirk and the non-examining DDS consultants, did not consider Plaintiff's hip impairment which was developed thereafter.  Dr. Siekerkotte's consultative examination, although it did post-date the

---

[14] That also applies to some extent to his characterization of Plaintiff's ROM (including hip internal rotation) as "pretty good", though as noted above, normal ROM for hip internal ROM would be 40 degrees.
https://web.mit.edu/tkd/stretch/stretching_8.html

onset of hip pain, considered only Plaintiff's reports of pain and her examination, not the USC imaging records, clinical exams, or recommendation for total hip replacement.

The only doctor who had access to all pertinent information was Dr. Schmitter.  His functional "opinion" was not well articulated as it was an amalgamation of various responses he gave to the ALJ's questions about whether Plaintiff met a listing.  Importantly, his responses were predicated on misstatements of fact concerning the severity of Plaintiff's scoliosis and the adequacy of his hip range of motion, at least as concerns internal ROM.

To the extent Dr. Schmitter did articulate specific functional limitations, it does not appear the ALJ incorporated them despite purporting to give his opinion "much weight".  Rather, the ALJ made one RFC determination for the entire period under review despite Dr. Schmitter's explanation that Plaintiff's hip pain would further limit standing and walking, and reached an overall  more demanding RFC (light vs. sedentary) than the first ALJ made despite the development of Plaintiff's hip issues during the time period in between the two decisions.

Thus, the medical opinion evidence did not undermine Plaintiff's subjective complaints of disabling pain in his back and hip with extended sitting, standing, or walking.

**VI.   Conclusion**

The ALJ did not identify substantial evidence or clear and convincing reasons for rejecting Plaintiff's testimony about his sitting, standing, walking, and postural limitations attributable to his severe residual scoliosis post-surgical repair, and his hip impairment for which a total hip replacement was recommended.  Remand is therefore appropriate for Commissioner to reconsider Plaintiff's statements concerning the intensity, persistence and limiting effects of his pain, any developments with respect to his hip impairment or other impairments, to develop the record as necessary, hold a new hearing, and issue a new decision.

**VII.   Order**

For the reasons stated above, substantial evidence and applicable law do not support the ALJ's conclusion that Plaintiff was not disabled.   Accordingly, it is ordered that the Commissioner's decision is reversed, and this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  The Clerk of Court is directed to enter judgment in favor of Plaintiff Michael D. Jackson and against Defendant Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   __**May 10, 2024**__                              _____**/s/ Gary S. Austin**_____
                                                                    UNITED STATES MAGISTRATE JUDGE

23